**VAIVAO FRUEAN, FUGA T. TELESO, and TAITO AFA, Plaintiffs**

**v.**

**DOUGLAS O. CRADDICK, Defendant**

**MARTIN ANDERSON, Plaintiff**

**v.**

**AMERICAN SAMOA GOVERNMENT, Defendant**

High Court of American Samoa
Land and Titles Division

LT No. 40-85
LT No. 02-87

March 21, 1990

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiffs Vaivao, Teleso, and Taito, Tau'ese P.F. Sunia
       For Defendant Craddick, William H. Reardon
       For Plaintiff Anderson, William H. Reardon
       For Defendant American Samoa Government, Arthur Ripley Jr., Assistant Attorney General

*LT No. 40-85*

The plaintiffs are the senior matai of the respective Vaivao, Fuga, and Taito families of Pago Pago. They sue to enjoin the defendant, Douglas Craddick, from encroaching on a certain land area which they claim is a part of that communal land of their families known as "Fusi." They further petition to quiet title, and in addition they seek compensation for unspecified damage to the land.

Craddick, on the other hand, claims that the disputed area is freehold land,[1] being a portion of the old Foster estate "Logopesega."[2] The Territorial Registrar's records reflect that in the late 1890s, title to the land Logopesega was vested by the Supreme Court of Samoa in one Jane Sophia Foster by Court Grant 852. The land is said to contain 2 acres and 5 perches and Court Grant 852 is recorded with the Territorial

---

[1]    Freehold land is statutorily defined as "all those lands included in court grants prior to 1900." A.S.C.A. § 37.0201(b).

[2]    Also spelt elsewhere as "Lotopesega." *See Foster v. Olotoa*, 3 A.S.R. 76 (1953).

Registrar in Volume 1, Court Grants at pages 169-70.[3] In 1981, Craddick purchased the Logopesega estate from the heirs of Jane Foster. *See Craddick v. Manuma,* LT Nos. 04-84 & 30-84 consolidated (1984). Martin Anderson has been permitted to intervene as Craddick's assignee or successor in interest and accordingly when referencing Craddick herein we are also referring to Anderson.

*Facts*

This case concerns an area of land located in the village of Pago Pago immediately on the mauga side of the main government east-west highway opposite to what is now known as the Pago Pago Plaza --- a shopping and office complex recently built by Craddick. The dispute before us today is the product of a number of factors with the most significant one being the passage of time. On the one hand, certain public records assure Craddick that the Foster estate contained some 2 acres of freehold land. However, just exactly where that 2 acres is situated has become unclear for a number of reasons. The original survey contained in Court Grant 852 references the monuments as being pins, at certain points on a stone wall long since forgotten, on a creek bank which could have changed over time, and at certain high water marks on an undoubtedly shifting shoreline. In addition, the Fosters have not recently shown a presence in the area consistent with ownership and the exercise of proprietary rights over an area of land of 2 acres and 5 perches. The gist, therefore, of Craddick's case is that, given the probable location of the high water mark (at the time of the court grant), an estate with an area as described in Court Grant 852 must necessarily include land on the mauga side of the main east-west highway. While the argument appears appealing at first blush, there are additional complicating factors which cannot be ignored. The evidence was clear. The disputed area has been, at least within living memory, in the exclusive use and occupation of the plaintiff families. According to the matai, their families have occupied this land from as far as they could individually remember, and the Fosters in that time have never bothered them nor have they bothered the Fosters. High Talking Chief Tuaolo Lemoe's testimony was in accord. He is 73 years of age and has lived all his life in the village of Pago Pago. He testified that the only people he has known to be in possession of the area in dispute have been members of the plaintiff families. The Fosters, he said, always kept to

---

[3]   For a more detailed background to Court Grant 852, *see Foster v. Olotoa,* 3 A.S.R. 76 (1953), *Craddick v. Manuma,* LT Nos. 04-84 & 30-84 consolidated (1984).

the sami side of the main road. Tuaolo further testified that the area was commonly known to the village as "Fusi," owing to its constantly water logged condition conducive to the growing of certain taro.

*Discussion*

The Court is faced with the task of somehow reconciling these factual inconsistencies although there was no attempt on the evidence to explain these apparent contradictions. For reasons given, we find for the plaintiffs.

Firstly, we cannot accept the surveyor's reconstruction exercise as being persuasive given the paucity of data he had to work with and the number of assumptions he was accordingly required to make. In the end, the exercise clearly took on the appearance of a dire search for premises to sustain a foregone conclusion. For example, in the way of physical evidence, some stress was placed on the fact that a row of plaintiffs' homes on one side of the stream was situated in a manner which happened to be consistent with one of the boundary lines as reconstructed. In the surveyor's judgment, a row of homes which appeared to be carefully situated was, in accordance with sound survey practice, a very good indication that the owners had no claims beyond the line as retraced. This assumption holds little water when viewed against the fact that the survey also shows boundary lines running on the opposing side of the stream to include other existing structures belonging to plaintiffs. In any event, it appeared more credible on the actual testimony that the resulting alignment of the houses had a lot more to do with their being deliberately situated on dry ground (which in some places was the result of a built up embankment) to avoid the recurrent flooding in the area, rather than having anything to do with a considered deference to a boundary line with the Foster family. Also from the reconstruction of the Logopesega survey, the disputed land is now bisected by a stream. The estate's original description and survey, however, showed the stream as actually being Logopesega's northernmost boundary line. The surveyor simply takes the position that the stream's banks have since changed.[4]

---

[4] We note that the surveyor makes no allowance for the significant accretion thus resulting in favor of plaintiffs as a result of that change; however, he does take a position in the companion case with regard to adjusting rights to shore-front reclamation as coming within standard surveying practice.

The Court was also told that a small part of the "stone wall" mentioned in Court Grant 852 was located and that this represented a significant clue to the reconstruction. When the Court viewed the disputed area, its attention was directed to a small digging which revealed what appeared to be an otherwise hidden or covered arrangement of large river rocks. The plaintiffs denied that the find was anything in the way of an ancient wall and claim that they in fact had actually pointed out the rocks to the surveyor who was asking for the remnants of a stone wall. They gave the more plausible explanation for the hidden rock formation, which they said was erected by family members to elevate those homesites confronting the bend in the stream since they were prone to flooding from overflow during heavy rains. Flooding in the area was said to be quite common.

Quite apart from the difficulties with hard data, the resultant reconstruction survey must also have been influenced by those settlement efforts between Craddick and the American Samoa Government concerning the seaward side of Logopesega. Since these settlement efforts entailed an exercise of give and take on the part of both parties, they do not necessarily reflect the estate's original boundary lines. *See* Agreement for Negotiated Settlement, *Craddick v. American Samoa Government*, LT No. 20-85 (1986).

A telling factor against the reconstructed boundaries lines is simply that they could not be reconciled with the stark reality that a number of Pago Pago's established families seemed well and truly settled in and about the disputed area, to the exclusion of the Fosters. Our examination of the evidence as a whole convinces us that the plaintiff families have had possession of the disputed area for a great number of years while exercising proprietary rights thereon. The evidence also clearly suggests that such possession has been had without any interruption whatsoever from the Fosters. Even if we assumed for the sake of argument that Court Grant 852 included this area occupied by the plaintiffs, the recent interruption by Craddick (successor to the Fosters) has come a little too late to prevent the operation of A.S.C.A. § 37.0120(a). This enactment provides that "[a]ctual, open, notorious, hostile, exclusive and continuous occupancy of real estate for 30 years confers a title thereto by adverse possession which is sufficient against all." Plaintiffs' possession of the disputed land area certainly qualifies to confer title on them.

Finally, an explanation for the Foster family's absence from the mauga side of road is to be found in *Foster v. Olotoa*, 3 A.S.R. 76

(1952). This case points out that a part of Logopesega known as Heman Foster's share of the estate had been lost through the adverse possession of one Teutusi.[5] The significance of Heman Foster's share of the estate is that it is said to comprise that part of Logopesega which is "inland" of the main road. The case spoke of Jane Sophia Foster's will, wherein the testator devised a part of Logopesega to her grandson Heman in the following language, "I give, devise and bequeath to my grandson Heman that piece of my land *on the inland side of the main road* in Pago Pago extending from Wolbert's leasehold to the little creek." *Id.* at 77-78 (emphasis added). The estate, however, to the seaward side of the road was bequeathed to the testator's son Wesley. With regard to the property *on the inland side of the main road*, the Court found that:

> Some years after Jane Sophia Foster's death, Heman's father, Fanene, apparently considering the land which had been devised to his son as his own, conveyed it to one Teutusi, who went into possession thereof and continued in such possession for more than 20 years, claiming the land conveyed as his individually owned property. In the case of *Gaoteote Foster et al. v. George Fiaalii*, No. 11-1952, the High Court held that this land devised to Heman became the property of Teutusi through adverse possession. Teutusi's heirs let George Fiaalii (who is Olotoa and the defendant in this case) into possession of the part of Lotopesega which was devised to Heman.

*Foster v. Olotoa*, 3 A.S.R. at 78. It is trite observation that Craddick can only get from the Fosters that which they had to give. The foregoing case naturally raises the question as to what exactly Craddick purchased "on the inland side of the main road" if indeed the inland part of Logopesega had been lost by adverse possession to one Teutusi.

In view of the foregoing, we conclude that the plaintiffs' claim to the disputed area on the mauga side of the main road is superior to that of defendant Craddick's. Plaintiffs' undisturbed and longstanding possession of the area speaks rather forcefully in favor of the plaintiff families. Craddick's claim, on the other hand, is less tenable. For many, many years now the Fosters have not acted in a manner consistent

---

[5]    *Cf. Craddick v. Olotoa*, LT Nos. 04-98 & 30-84 consolidated (1984). This case arrived at a totally conflicting conclusion.

with the ownership of land on the mauga side of the road, whereas plaintiffs undeniably have. Just what remains of the Foster estate and where it is exactly located are questions for which answers have become more obscure with the passage of time. Given present day realities, the dispute as to better entitlement must be resolved in favor of plaintiffs in possession.

However, the specific relief sought by plaintiffs will not be granted. There was absolutely no proof offered on the damages alleged, and with regard to the injunctive relief sought, none of the plaintiffs bothered to provide surveys delineating their exact interests requiring injunctive relief. Finally, the prayer for quiet title is meaningless without a survey and without first complying with those statutory requirements relating to the registration of title. A.S.C.A. §§ 37.0101 et seq.

### LT No. 02-87

Court Grant 852 was originally bounded by the high water mark and this case involves the land on the sami side of the main road. Specifically, the dispute arose with plaintiff Anderson's assignor, Craddick, laying claims as upland or "littoral" landowner entitled to a certain area of abutting filled land.[6] This filled land was the result of an extensive reclamation project undertaken by the government in the Pago Pago harbor. At issue is whether the owner of Court Grant 852 or the government owns the reclaimed land.[7] The immediate difficulty with plaintiff's claim is that it is based on the contention that he is the upland or littoral landowner. This contention, however, is entirely at odds with the holding in *Lago v. Mageo*, 4 A.S.R. 287 (1962), *aff'd*, 4 A.S.R. 874

---

[6] This area presently serves as the parking lot for the Pago Plaza. In order to facilitate the building permit for the Pago Plaza structure, which required adequate parking facilities, among other things, a document dated 13th September, 1985, styled "Lease of Property and Agreement For Installation of Parking Lot" was entered into between Craddick and the government to allow the parking lot to be built pending final disposition of the parties' dispute. Adequate parking was apparently a condition to the granting of a building permit for the Pago Plaza.

[7] The survey submitted of plaintiff's claim again took on the unfortunate appearance of setting out a foregone conclusion, namely, the approximate layout of the existing car park. The surveyor alluded to a number of possibilities for extending lines to newly gotten land, and his conclusion was ultimately based on what he judged as being most fair to both parties given the present existing physical layout. Presuming that plaintiff's legal position prevails, the immediate problem with the surveyor's conclusion of fairness is that it does not necessarily take into account the problems to be encountered with adjusting the rights of other remaining littoral owners.

114

(1963). This case was concerned with littoral claims to the property on the other side of the Vaipito stream and immediately next door, so to speak, to the area in dispute. The *Lago* court upheld the territorial government's rights as the upland or littoral owner within the harbor area between Blunt's Point and Breaker's Point by virtue of certain condemnation proceedings pursuant to Ordinance No. 15 and Regulation No. 16 of the United States Naval Station, Tutuila, enacted September 3, 1900. Ordinance No. 15 and Regulation No. 16 were later codified by the Legislative Branch of the Government of American Samoa as § 1291 of the Code of American Samoa, 1949, and now appear on our statute book as A.S.C.A. § 37.2050.[8]

This statute clearly gives the government a uniform fifteen feet of land in from the shoreline. Anderson argues that only a road is needed, and not any shore, and that the statute should be narrowly construed to protect private property rights. The statute refers to the land as appropriated for "public uses," which would include a road and also power poles, telephone poles, and any necessary seawalls to check erosion. It would be rather difficult to otherwise construe this statute --- "15 feet distant inland from the shore" is 15 feet whether broadly or narrowly construed. The case cited by plaintiff, *Wilson v. State*, 400 So.2d 740 (La. App. 1981), examines the limits on Louisiana's general power of eminent domain.[9] In that case, there was no statute as there is in the current situation. To sustain the contention advanced by plaintiff that the government merely acquired "legitimate title to the land where the road runs," while ignoring the clear language of the statute in the name of statutory construction, would surely be to interfere with the government's exercise of its eminent domain power. In any event, a taking of 15 feet inland from the shoreline is hardly overbroad given the various public uses for which the condemned property may be put and,

---

[8]     A.S.C.A. § 37.2050 reads:

The public highway declared and proclaimed by Regulations No. 15 and No. 16, 1900, enacted 3 September 1900 by B.F. Tilley, U.S.N., Commandant, and amended by W. Evans, Captain, U.S.N., on 10 May 1921, extending from Blunt's Point on the southern side of Pago Pago Harbor, toward Observatory Point and around the harbor to Breaker's Point on the northern side of the harbor, along the shore at high water mark, of a uniform width of 15 feet distant inland from the shore, the land included in the description being condemned and appropriated for public uses, is recognized as a public highway, and the rights of the government and public thereto is asserted.

[9]     *Cf. Atualevao v. American Samoa Government*, 2 A.S.R.2d 66 (1985).

indeed, the very requirements of roading itself. With the increasing demands of modern day automobile traffic within the territory, there is logically no alternative available to the government for road improvements in the Pago Pago bay area but the possibility of going sami side. The taking of the shoreline is thus totally consistent with public roading purposes in the area.

Finally, the government's defense of laches is worth noting. The taking (of littoral rights) which plaintiff is now protesting occurred 90 years ago. On the other hand, an action for the recovery of real property is barred if not brought within 20 years after such cause accrues. A.S.C.A. § 43.0120(6). The argument advanced by plaintiff that "the Fosters never had reason to believe that their property had been taken" is simply without merit. An ordinance or published law announced the taking of fifteen feet of shoreline from Blunt's Point to Breaker's Point. The language of the ordinance admits no exception.

We conclude that the reclaimed or filled land in question is the property of the American Samoa Government. Judgment accordingly.

It is so Ordered.